**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**SERVICE EMPLOYEES INTERNATIONAL UNION NATIONAL INDUSTRY PENSION FUND, *et al.*,**

**Plaintiffs,**

**v.**

**SCIENTIFIC AND COMMERCIAL SYSTEMS CORPORATION, *et al.*,**

**Defendants.**

**Civil Action No. 13-1705 (JEB)**

# MEMORANDUM OPINION

For the past five years, Plaintiff Service Employees International Union's National Industry Pension Fund has been chasing down Defendant Scientific Commercial Systems Corporation, requesting that it pay its arrears. It all started when SCSC began janitorial work as a subcontractor to Tessada & Associates, Inc., then a contractor with the National Aeronautics and Space Administration. In that role, Defendant hired the Union's members and was contractually obligated to contribute to the Fund's pension plan. Whatever space-age glamour might have existed all came to an end when Tessada's own circumstances forced it to terminate SCSC, an action that in turn caused SCSC to cancel its Union contract. From then on, the Fund hounded SCSC for statutory payments due upon withdrawal from a pension plan. That dogged pursuit has now reached federal court in the form of the Fund's suit against SCSC.

The Fund now seeks summary judgment for its still-outstanding withdrawal liability. Discarding each of SCSC's defenses, the Court will grant the Motion.

## I. Background

The Court's prior Opinion in this case offers a brief primer on this pension-plan drama. See Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Sci. & Commercial Sys. Corp., No. 13-1705, 2015 WL 4078006, at *1-2 (D.D.C. July 2, 2015). For purposes of this Motion, the Court draws from the parties' renditions of the facts – largely undisputed – drawing all reasonable inferences in SCSC's favor.

### A. Factual Background

In 2009, NASA awarded a work contract to Tessada, which subcontracted with SCSC to perform certain tasks, namely janitorial and other support services at the Ames Research Center in California. See ECF No. 53 (Defendant's Statement of Facts), ¶ 2; ECF No. 52, Exh. 7 (Contracting Officer Decision). Defendant then hired Union members, signing on to a series of collective-bargaining agreements with SEIU. See DSOF, ¶ 3; ECF No. 47, Exh. 2 (Collective-Bargaining Agreements). As part of its obligations under those CBAs, SCSC contributed to Union members' pensions by making payments to the Fund. See DSOF, ¶ 4.

This relationship fell apart in November 2011 when Tessada – apparently because of its own funding issues – terminated Defendant. See DSOF, ¶ 5; ECF No. 8 (SCSC Answer), ¶ 66. From then on, Tessada took over the NASA contract's janitorial duties by hiring as its own SCSC's former employees. See DSOF, ¶ 5; Contracting Officer Decision at 3 ("All employees that had worked for [SCSC] were hired by Tessada . . . ."). Tessada also continued Fund payments for those employees. See DSOF, ¶ 5; ECF No. 52, Exh. 9 (Union Forms).

On June 12, 2012, the Fund notified SCSC that by way of its termination it had incurred a "complete withdrawal" from the pension plan. See DSOF, ¶ 7; ECF No. 47, Exh. 6 (Withdrawal Notice). That notice informed Defendant that under the Employee Retirement

Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, as amended by The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 *et seq.*, it owed Plaintiff "withdrawal liability" of $1,117,162.72. See Withdrawal Notice. Displeased with this hefty assessment, on July 15, 2012, SCSC sent a letter to the Fund requesting review of the details of those withdrawal payments. See DSOF, ¶ 8. In the course of that letter, Defendant acknowledged that "as a result of an illegal contract termination . . . we are immediately obligated to pay withdrawal assessments in excess of one million dollars," but also advised the Fund that it was pursuing a contract claim against Tessada and for that purpose needed a ninety-day "hiatus" on any payments. See ECF No. 47, Exh. 7 (Request for Review) at 1-2.

The Fund obliged. See ECF No. 47 (Plaintiff's Statement of Facts), ¶ 10. By August 2012, however, SCSC's breach-of-contract action had stalled, as a district court in Virginia granted summary judgment in Tessada's favor. See Sci. & Commercial Sys. Corp. v. Tessada Assocs., Inc., No. 11-1278, 2012 WL 3866497 (E.D. Va. Aug. 30, 2012), aff'd, 542 F. App'x 239 (4th Cir. 2013) (*per curiam*).

Undeterred, Defendant tried a different tack. In November 2012, it told Plaintiff that under the McNamara–O'Hara Service Contract Act of 1965 (SCA), 41 U.S.C. §§ 6701-6707, Tessada should have sought an "equitable adjustment" to its contract – *i.e.*, obtained additional compensation from NASA commensurate with the withdrawal assessment – and then used that money to pay off SCSC's debt. See DSOF, ¶ 10; ECF No. 52, Exh. 5 (Nov. 1, 2012, Email from SCSC to Fund). The Fund disagreed. It responded by email in December 2012, letting SCSC know that it "remains liable for its complete withdrawal" and that liability could not be shifted to Tessada under the SCA. See ECF No. 47, Exh. 9 (Dec. 17, 2012, Email from Fund to SCSC) (reasoning that "Fund cannot enforce the SCA" and "benefits protected by the [Act] likely do not

include withdrawal liability"). Per an attachment, Defendant's revised payment schedule would start in January 2013. See ECF No. 47, Exh. 8 (Revised Withdrawal Notice).

Defendant missed that payment, and a few weeks later Plaintiff notified SCSC that it would be in default if no payment was made within sixty days. See ECF No. 47, Exh. 12 (Delinquency Notice). To date, SCSC has not paid. See PSOF, ¶ 19; DSOF, ¶¶ 21-22.

B. Procedural Background

Desiring to end its payment truffle hunt, the Fund (and its Trustees) filed the present action against SCSC in November 2013 to claim the owed withdrawal liability. SCSC answered, counterclaimed against the Fund, and cross-claimed against Tessada. On the cross-claims, Defendant sought "declaratory judgment and equitable relief to declare that [Tessada] is liable to Plaintiff for any withdrawal liability assessed against SCSC and liable to indemnify SCSC for the same." SCSC Answer, ¶ 105.

Once Tessada entered the action, the parties agreed to stay the proceedings. See ECF No. 10 (Joint Motion for Stay). As SCSC had hoped, Tessada availed itself of the SCA to seek an equitable adjustment from NASA around July 2013. See Contracting Officer Decision at 1. In April 2014, however, a NASA contracting officer denied this request, explaining that "[t]he withdrawal liability that Tessada . . . is trying to pass on to the Government has nothing to do with [its] cost of compliance with the terms of the CBA." Id. at 2. In other words, NASA would not pay Tessada extra money (to then be paid to SCSC) when there was no extra cost to Tessada in performing on the contract. The company nonetheless appealed that decision to the Armed Services Board of Contract Appeals. See ECF No. 52, Exh. 8 (ASBCA Notice of Docketing).

In November 2014, SCSC and Tessada assured this Court that the ASBCA had let them know "a decision was imminent and would be rendered within the next 60 days." ECF No. 21

(SCSC & Tessada's Joint Status Report). Heeding this timeline, the Court lifted the stay so that the case could proceed if no ASBCA decision was issued by March 12, 2015. See Minute Order (Jan. 26, 2015).

Once March rolled around without an ASBCA ruling, the parties wasted no time. Tessada answered, with cross-claims against Defendant and a request to stay Plaintiff's withdrawal-liability collection. See ECF No. 24 (Tessada Answer), ¶ 92. As for the Fund, it immediately moved to dismiss SCSC's counterclaims against it, arguing that an employer was required to request arbitration before challenging the withdrawal determination in court. See ECF No. 22 (Motion to Dismiss) at 4-5. In denying the motion, the Court acknowledged that, even if this were the case, because the "arbitrate-first rule" can be waived, "it is ultimately the Fund's responsibility to prove that SCSC failed to timely arbitrate its claims." SEIU, 2015 WL 4078006, at *3 (emphasis added). In other words, the Court found "this Motion to Dismiss the wrong stage to adjudicate them." Id.

The Fund has now returned with this Motion for Summary Judgment, and the stage is mostly set. But first, a few notes about Tessada. On February 26, 2016, Plaintiff filed a motion for summary judgment against it concerning the counterclaim that withdrawal-liability collection should be stayed, see ECF No. 48, and two months later, Defendant moved to dismiss its cross-claims. See ECF No. 54. Tessada has not responded, and the other parties have raised the possibility of its bankruptcy. As no Notice of Bankruptcy has ever been filed in this case, however, the Court will not infer this is the reason for its lassitude. In fact, in March, the ASBCA dismissed Tessada's appeal for failure to prosecute. See Tessada & Assocs., Inc., ASBCA No. 59446 (Mar. 7, 2016). This Court, in turn, likewise dismissed its cross-claims

against SCSC without prejudice. See Minute Order (June 1, 2016). The Fund's motion for summary judgment against Tessada remains pending.

In the instant Motion, Plaintiff seeks summary judgment against SCSC. Before the Court addresses that Motion's substance, however, it would be remiss not to comment on some factual inconsistencies in the briefing. Even generously reading the evidence in SCSC's favor, some of the facts that it alleges find no support in (or are even directly contradicted by) the record it cites. Portions of its Statement of Facts (and Opposition) cannot be fairly drawn from the referenced exhibits. Compare, e.g., DSOF, ¶ 9 ("SCSC advised [the Fund] that it was not liable for withdrawal liability because SCSC did not withdraw from the plan but that [Tessada] terminated SCSC's subcontract and took over SCSC's employees.") (emphasis added) (citing Request for Review), with Request for Review at 1 (explaining that "SCSC was forced to withdraw from the pension program . . . [and] [a]s a consequence, we are immediately obligated to pay withdrawal assessments in excess of one million dollars" and making out only "an appeal for a ninety day delay in the initiation of liability payments") (emphasis added); and DSOF, ¶ 10 ("On November 1, 2012 SCSC also sent [the Fund] an email detailing the administrative remedies under the SCA and asking [the Fund] to jointly pursue said remedies from [Tessada].") (emphasis added) (citing Nov. 1, 2012, Email from SCSC to Fund), with Nov. 1, 2012, Email from SCSC to Fund at 2 ("In other words, [the Fund] should look to Tessada to recover the 'withdrawal liability' as it arises under its prime contract, and only it [*i.e.*, Tessada] has the ability to petition the government for an equitable adjustment.") (emphasis added).

Even if Defendant would prefer it, this Court declines to stretch the facts like taffy. Throughout this Opinion, the Court must rely on a reading of the record that a reasonable jury could possibly endorse. The preliminaries now dispensed with, the Motion is ripe.

## II. Legal Standard

The Court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence presented would permit a reasonable jury to return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895; see also Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

As to the evidence available to the Court, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). That is, the nonmoving party may not merely make unsupported allegations or denials, but must instead rely on affidavits, declarations, or other competent evidence that set forth specific facts that point to the presence of a triable issue. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In viewing this record, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). The Court, in turn, must "eschew making credibility determinations" and avoid "weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

## III. Analysis

This case concerns the steps that must occur when a pension fund and an employer's relationship ends. The relevant statute, ERISA, "comprehensively regulates, among other things, employee welfare benefit plans" in an effort "'to protect . . . participants in employee benefit plans and their beneficiaries.'" Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44 (1987) (quoting 29 U.S.C. § 1001(b)). Following concerns that certain ERISA statutory provisions created "an incentive for employers to withdraw from weak multiemployer plans," Congress amended the Act by enacting the MPPAA in 1980. Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 607 (1993) (citing cases that "canvass[] the history of ERISA and the MPPAA"); see Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 196 (1997) ("Congress enacted the MPPAA to protect the financial solvency of multiemployer pension plans.").

Relevant here, the MPPAA "requires most employers who withdraw from underfunded multiemployer pension plans to pay 'withdrawal liability.'" Bay Area Laundry, 522 U.S. at 196 (29 U.S.C. § 1381(a)). Although "withdrawal" may be a strange expression in certain contexts – remember, Tessada terminated SCSC here – that term broadly includes any instance when an employer "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). Defendant, which ceased to employ Union members or pay toward their pensions, appears to fit into that definition. See DSOF, ¶¶ 5-6.

Actually obtaining withdrawal liability is a whole other story, as Plaintiff has found out the hard way. The MPPAA first sets forth how to calculate the withdrawal-liability amount and set the payment schedule. See Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz

Brewing Co., 513 U.S. 414, 419 (1995). The Act "confides to the plan [trustees] responsibility for determining the amount of withdrawal liability, notifying the employer, and collecting the amount due." Grand Union Co. v. Food Emp'rs Labor Relations Ass'n, 808 F.2d 66, 68 (D.C. Cir. 1987). Once the plan's trustees communicate the necessary information, the employer may within 90 days ask them "to review any specific matter relating to the determination of the employer's liability and the schedule of payments." 29 U.S.C. § 1399(b)(2)(A)(i). The trustees typically then conduct a "reasonable review" of the issues raised and notify the employer of their decision. See id. § 1399(b)(2)(B). Any further dispute "shall be resolved through arbitration," which must be sought within 60 days after the plan's decision on the request for review or, if no decision has been rendered, after 120 days following the date of the request. Id. § 1401(a). This last, arbitral requirement has been given an appropriate moniker: the "arbitrate first" rule. See, e.g., Grand Union, 808 F.2d at 70.

"If no party requests arbitration, the installments become 'due and owing' on the trustees' schedule." Bay Area Laundry, 522 U.S. at 197 (quoting 29 U.S.C. § 1401(b)(1)). That payment obligation persists, however, even if the employer requests arbitration, as the MPPAA institutes a "pay now, dispute later" collection procedure. Id. (quoting Robbins v. Pepsi-Cola Metro. Bottling Co., 800 F.2d 641, 642 (7th Cir. 1986) (*per curiam*)). Failure to pay carries with it stark consequences. The pension plan may accelerate all payments and sue to collect in federal court. See 29 U.S.C. §§ 1399(c)(5), 1401(b)(1), 1451(b).

In federal court the Fund now is. Its summary-judgment Motion narrates a by-the-book MPPAA theory of why SCSC is liable: The company withdrew from the Fund, and, even though it initially protested, it never requested arbitration or made any withdrawal payments. These facts are hardly in dispute. See PSOF, ¶¶ 15-16; DSOF (making no mention of any request by

SCSC to initiate arbitration). Even if one of Defendant's emails – which makes no use of any permutation of the word "arbitrate" – could, through the looking glass, somehow be interpreted as an arbitration request, SCSC would still be liable for interim payments (which it has not made). See DSOF, ¶ 13 (citing communications to support allegation that "SCSC could not initiate joint arbitration," but making no mention of actual attempt to do so) (emphasis added); see also 29 U.S.C. § 1401(d) (requiring interim payments to stave off delinquency). Payments – of some amount – are thus "due and owing." Id. § 1401(b)(1).

What, then, is Defendant's excuse? It leans on a number of theories – namely, that: (1) no withdrawal occurred, (2) special withdrawal-liability rules apply to employers covered by the SCA, (3) the Fund waived the arbitrate-first rule, (4) Tessada has admitted to liability, and (5) for various reasons, the withdrawal-liability amount is unlawful.

Before the Court dives in, it notes that because Defendant never asked for arbitration, it has forfeited its challenges to "any specific matter relating to the determination of the employer's liability and the schedule of payments." 29 U.S.C. § 1399(b)(2)(A)(i); see id. § 1401(a); PGBC v. R.A. Gray & Co., 467 U.S. 717, 726 n.4 (1984) ("[A]lthough [the employer] could have initiated arbitration with the Pension Plan on these issues, 29 U.S.C. § 1401(a), it accepted these findings and waived its right to arbitration . . . ."). Indeed, this Circuit has been quite definitive in "requir[ing] the employers . . . to have resorted initially to arbitration in order to interpose defenses to assessments of withdrawal liability." I.A.M. Nat'l Pension Fund v. Clinton Engines Corp., 825 F.2d 415, 421-22 (D.C. Cir. 1987). Although this arbitrate-first requirement would leave only Defendant's third defense (waiver) on the table, see id. at 422, the Court, in an abundance of caution, addresses all of SCSC's arguments – which attack each stage of the withdrawal-liability process – *seriatim.*

A. Absence of Withdrawal

Challenging the basic premise of its liability, SCSC first argues that there was no withdrawal at all. See Opp. at 6-7, 36-39. On this score, the MPPAA provides: "Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because . . . an employer ceases to exist by reason of . . . a change to an unincorporated form of business enterprise." 29 U.S.C. § 1398(1)(B); see CenTra, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund, 578 F.3d 592, 599 (7th Cir. 2009) (describing provision as "'safe harbor[]' exempting predecessor employers from withdrawal liability"). Defendant alleges that the "teaming arrangement/partnership between SCSC and [Tessada] constituted an 'unincorporated form of business" and that this form changed when Tessada terminated SCSC. See Opp. at 37-38.

Defendant appears to have misread the statutory language. First off, this withdrawal exception applies only when "an employer ceases to exist," 29 U.S.C. § 1398(1)(B), and, *à la* Mark Twain, "rumors of [its] death have been greatly exaggerated," as SCSC appears to be alive and well before the Court today. Next, that non-existence must be caused by "a change to an unincorporated form of business enterprise." Id. (emphasis added); Teamsters Pension Tr. Fund of Phila. & Vicinity v. Headley's Express & Storage Co., No. 92-5688, 1993 WL 189933, at *5 (E.D. Pa. June 3, 1993) (holding exception applies only when corporation "continue[s] operations in an unincorporated form or start[s] a new corporation"). SCSC only claims that it and Tessada together were an unincorporated enterprise – not that the change was to such a form. In other words, § 1398 merely functions as a "corporate restructuring exception." Penn Cent. Corp. v. W. Conference of Teamsters Pension Tr. Fund, 863 F. Supp. 1131, 1135 (N.D. Cal. 1994); see Cent. States, Se. & Sw. Areas Pension Fund v. Sherwin-Williams Co., 71 F.3d 1338,

1342 (7th Cir. 1995). It is targeted at situations where an employer sought "to evade withdrawal liability by going out of business and resuming business under a different identity," Connors v. B & W Coal Co., 646 F. Supp. 164, 168 (D.D.C. 1986) (quoting 126 Cong. Rec. H7898 (daily ed. Aug. 25, 1980)), a concern without relevance here.

B. Special Withdrawal-Liability Rules

The next batch of arguments relates to special withdrawal-liability rules for certain employers governed by the Service Contract Act. Prefatorily, it appears undisputed that SCSC is an SCA employer, as that Act broadly covers companies providing services on federal-government contracts worth at least $2,500. See 41 U.S.C. § 6702(a). Defendant goes on to identify special rules that the Pension Benefit Guaranty Corporation approved following a request by another pension fund that enlists SCA employers – the I.A.M. Fund – which it believes should govern here. See Approval of Amendment to Special Withdrawal Liability Rules[;] the I.A.M. National Pension Fund National Pension Plan (I.A.M. Fund Approval), 78 Fed. Reg. 48,506 (Aug. 8, 2013). Pursuant to those rules – which narrow withdrawal liability to only three situations – SCSC alleges that it would not have incurred withdrawal liability. See id. at 48,507 (incorporating 29 U.S.C. § 1383(b)(2)); see also Opp. at 30-31.

Unfortunately for Defendant, the problem here is that those rules simply do not apply, as it nowhere claims that it is part of the I.A.M. Fund. Under the PBGC's regulations, a fund (such as the I.A.M. Fund) may request special rules that "[c]over an entire industry or industries, or be limited to a segment of an industry." 29 C.F.R. § 4203.3(b)(1). The I.A.M. Fund Approval, by its terms, is so "limited" – it covers only "certain employers that maintain the I.A.M. Fund." 78 Fed. Reg. at 48,506; cf., e.g., Approval of Amendment to Special Withdrawal Liability Rules for International Longshoremen's and Warehousemen's Union-Pacific Maritime Association

Pension Plan, 68 Fed. Reg. 46,668 (Aug. 6, 2003) (adopting special fund-specific rules for Union-Pacific Maritime Association Pension Plan). The special rules, however, could not be reasonably read as covering a non-I.A.M. Fund employer, such as SCSC. As described above, they have conditions specific to SCA companies contributing to the I.A.M. Fund. See 78 Fed. Reg. at 48,507.

In response, Defendant makes an equal-protection argument that the PBGC-approved I.A.M. Fund rules should nonetheless apply because the Fund in this case is similarly situated insofar as it also involves SCA employers. This theory ignores a crucial distinction. Where the I.A.M. Fund asked for special rules pursuant to PBGC regulations and the PBGC granted them, see 77 Fed. Reg. 76,090 (Dec. 26, 2012), the present Fund never made such a request. See 3883 Conn. LLC v. District of Columbia, 336 F.3d 1068, 1075 (D.C. Cir. 2003) (holding government may impose regulatory requirements on other parties, so long as it does not do so to "target[] [Plaintiff] without a legitimate reason"). Without these special rules to rely on, Defendant is then stuck with the default ERISA and MPPAA withdrawal requirements.

C. Waiver of Arbitrate-First Rule

Defendant's third argument requires special attention, as it cannot be forfeited by failing to request arbitration. See Clinton Engines, 825 F.2d at 422. This is because SCSC here contends that the Fund has already waived the arbitrate-first rule, meaning that Defendant may bring its defenses and counterclaims directly to this Court.

The waiver exception to the arbitrability requirement was first articulated in I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Industries, 727 F.2d 1204 (D.C. Cir. 1984). In that case, the employer requested arbitration, but the pension fund declined the offer and instead filed suit. Id. at 1206. Only after losing in district court did the fund argue on appeal that

the statutorily required arbitration should have occurred first. Id. at 1207; see Grand Union, 808 F.2d at 69. Faced with the fund's failure to agree to arbitrate or to press it as a defense in district court, Stockton held that the district judge properly proceeded to the merits of the underlying withdrawal-liability dispute. See 727 F.2d at 1210. The D.C. Circuit has subsequently articulated that "Stockton waiver" defeats the arbitrate-first rule only if "neither party timely presses the plea in abatement" – *i.e.*, if neither party raises in court the need to arbitrate first – "and the court finds that deferring a court contest while the parties repair to arbitration 'will neither lead to the application of superior expertise nor promote judicial economy.'" Grand Union, 808 F.2d at 70 (emphasis omitted) (quoting Stockton, 727 F.2d at 1210); see I.A.M. Nat'l Pension Fund Plan A v. Tech. Tape, Inc., No. 87-2451, 1988 WL 13287, at *6 (D.D.C. Feb. 4, 1988) (explaining failure to press plea in abatement occurs when party "tardily demands arbitration" in court). "Equally important" to the waiver analysis, the employer must first seek arbitration but be "rebuffed by the plan sponsor." Clinton Engines, 825 F.2d at 417.

The dispute here is far cry from the "exceptional case" of Stockton. See Grand Union, 808 F.2d at 69; see also Clinton Engines, 825 F.2d at 418 (limiting Stockton to its "narrow circumstances"). For one, SCSC never even requested arbitration. The Fund, moreover, has pressed the arbitration point since the beginning. See Clinton Engines, 825 F.2d at 422 ("From the outset of [the] proceedings, the Fund pressed its insistence that defenses, if any, be raised initially in arbitration."). In its Complaint it noted that "SCSC did not timely initiate arbitration proceedings." ECF No. 1 (Complaint), ¶ 19. Then, once Defendant answered, Plaintiff moved to dismiss its counterclaims partially on the ground that it had failed to request arbitration. See Motion to Dismiss at 4-5. And now, on summary judgment, the Fund has renewed its argument that SCSC never sought arbitration. See Mot. at 12-14.

In rejoinder, SCSC contends that the Fund waived any reliance on the arbitrate-first rule by failing to exhaust separate arbitral remedies found in the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. Defendant's rope bridge between the MPPAA and the CDA, however, is long and shaky. The theory begins with a clause of the MPPAA requiring that "[a]n arbitration under this section shall be conducted in accordance with fair and equitable procedures to be promulgated by the [PBGC]." 29 U.S.C. § 1401(a)(2). PBGC regulations then provide that, in lieu of that agency's other established procedures, "an arbitration may be conducted in accordance with an alternative arbitration procedure approved by the PBGC." 29 C.F.R. § 4221.14. In this case, the Fund's pension-plan document adopts (with three exceptions, one of which is relevant here) the American Arbitration Association's rules, which the PBGC has approved. See ECF No. 47, Exh. 10 (Fund Plan), § 10.05(a); id. 11 (AAA Rules); see also 51 Fed. Reg. 22,585 (June 20, 1986).

What do the AAA Rules say? They provide that arbitrations begin when "[t]he initiating party gives notice to the other party of its intention to arbitrate." AAA Rules § 7(a). This, of course, SCSC did not do; hence, it seems that the Fund has not "refused" to arbitrate. So far, Defendant appears to be out of luck, and the CDA appears nowhere in sight.

Just hear me out, SCSC insists. The instant Fund Plan also permits, as one of its three exceptions, that as an alternative to those AAA Rules "[t]he parties may jointly agree to proceed to arbitration in accordance with other procedures that are consistent with regulations of the PBGC." Fund Plan, § 10.05(b)(3) (emphasis added). Sensing that the AAA Rules are of no help, SCSC thus solicits non-AAA procedures – namely, ones codified by the CDA.

Before diving in to the CDA, however, the Court pauses to note that the Fund Plan's alternative appears to be discretionary in that the parties may wish to jointly initiate arbitration.

It is difficult to read this clause as meaning that the parties must make joint efforts first if they wish to insist on arbitration in later proceedings. Even if such a reading were possible, the record reveals no instance where SCSC floated the idea of joint arbitration, only to be rebuffed by the Fund. See Grand Union, 808 F.2d at 69 (describing Stockton as applying only if fund comes to court, "skirting the employer's request for arbitration"). Although these reasons are enough to reject Defendant's entreaty to other CDA arbitral rules, given the enormous effort expended in briefing this theory, the Court addresses it. See Opp. at 2-4, 10-27.

SCSC presents as "other procedures" (that the Fund allegedly has not complied with) the joint-arbitration rules found in the CDA. This entire theory, however, is a Hail Mary. Although such arbitral procedures no doubt exist, see 41 U.S.C. §§ 7103(h)(1), 7105(g)(1), the CDA simply does not apply to a withdrawal-liability dispute between an employer and a pension fund. That Act pertains only to a "claim by a contractor against the Federal Government relating to a contract." 41 U.S.C. § 7103(a)(1). That is, any joint-arbitration rules contained in the CDA would cover only a quarrel between the contractor and the government – *e.g.*, Tessada and NASA's SCA equitable-adjustment dispute – a point that SCSC even admits. See Opp. at 16 ("First, [Tessada] must request an equitable adjustment from NASA, through NASA's contracting officer."). The Fund, even if it wished to, could not initiate the CDA's procedures, as it had no contract gripe with NASA. See Ingersoll-Rand Co. v. United States, 780 F.2d 74, 76 (D.C. Cir. 1985) (holding Act applies only if "claim is founded upon the contract"). SCSC likewise offers no case – and the Court has found none – where the CDA has somehow directly applied to a withdrawal-liability dispute between a fund and an employer.

Even assuming that the Fund had some obligation to encourage Tessada to avail itself of the CDA process – that is, so that Tessada could somehow obtain an equitable adjustment to then

repay SCSC's debts – Tessada did ultimately bring a claim through those procedures, and NASA's contracting officer denied the requested adjustment. See Contracting Officer Decision at 1. In terms of any "joint" action, petitioning Tessada to seek an adjustment appears to be all that the parties could have done; after that, there was no role for the Fund to play. But the Court cannot stretch the law so far as to suggest that the Fund waived the arbitrate-first rule when it failed to join with SCSC in seeking CDA arbitration to resolve not their withdrawal-liability dispute but a Tessada–NASA SCA equitable-adjustment dispute to which they both were bystanders. See Dec. 17, 2012, Email from Fund to SCSC (explaining that "Fund cannot enforce the SCA").

In short, absent any overtures from Defendant to pursue any form of arbitration available to Plaintiff, the Court cannot hold that the Fund somehow refused an unstated arbitral invitation. This is, then, a routine situation where the arbitrate-first rule applies.

D. Tessada's Liability Admission

This case is now winding up. Defendant argues penultimately that Tessada has admitted that it is responsible for the withdrawal liability. It cites in support two requests for admissions dated December 5, 2015, that Tessada has so far not answered. Those requests ask Tessada to admit that it "is wholly responsibly for any withdrawal liability." ECF No. 52, Exh. 1 (Requests for Admissions), ¶¶ 12-13. Yet just because Tessada is responsible for SCSC's liability does not mean that SCSC is not itself liable. Instead, Defendant could still be liable, subject to any cross-claim that would ultimately push that liability onto Tessada – *e.g.*, indemnification. SCSC, if it so wishes, may file such a summary-judgment motion, and Tessada would have the opportunity to offer any defenses available to it. The Court, however, will not halt this Motion on account of the possibility that Defendant may later ask Tessada to foot the bill.

E. Unlawful Withdrawal-Liability Amount

The Court last disposes of, in brief, SCSC's remaining pair of arguments: that the withdrawal-liability assessment is unreasonable and clearly erroneous, see 29 U.S.C. § 1401(a)(3)(A), and that it violates substantive due process. See Opp. at 44-45. First, ERISA provides an elaborate scheme for calculating the precise withdrawal-liability amount, see Milwaukee Brewery, 513 U.S. at 419, and Defendant points to no instance where the Fund got it wrong, let alone clearly wrong.

Second, the substantive-due-process claim relies on the notion, citing as support Justice O'Connor's concurrence in Connolly v. PBGC, 475 U.S. 211 (1986), that the Fund was not harmed because Tessada immediately took over. This line of argument has been squarely addressed by the D.C. Circuit: "[Defendant's] reliance on Justice O'Connor's separate concurrence in Connolly is misplaced: not only did she agree with the holding of the Court, but her concern was 'that the imposition of retroactive liability on employers for the benefit of employees may be arbitrary and irrational in the absence of any connection between the employer's conduct and some detriment to the employee,' a concern not implicated in this case." Connors v. Petitte Bros. Mining Co., 70 F.3d 637 (D.C. Cir. 1995) (*per curiam*) (emphasis omitted) (quoting Connolly, 475 U.S. at 229 (O'Connor, J., concurring)). Retroactive liability – *i.e.*, imposition of liability that would upset contractually agreed-upon pension-fund obligations – is not raised as a concern here; and the connection between conduct and detriment, in this case, is present. The point of withdrawal liability is not necessarily to punish miscreant employers for actually damaging the pension plan by withdrawing, but to vitiate any "incentive for employers to withdraw," which if done *en masse* could jeopardize the fund's existence. Concrete Pipe & Prod., 508 U.S. at 608. The connection thus is that withdrawal increases the economic risk and

diminishes the financial viability of the pension fund. Placing liability on the shoulders of a withdrawing employer – *e.g.*, SCSC – offsets those hazards.

## IV. Conclusion

For these reasons, the Court will grant Plaintiff's Motion for Summary Judgment. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: September 22, 2016